**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WOLFGANG WEISE,<br><br>Plaintiff,<br><br>vs.<br><br>U.S. DEPARTMENT OF STATE, et al.<br><br>Defendants. | **No. 26-cv-4422 (LJL)**<br>No. 24-cv-5760 (LJL) [related] |

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

I. Relevant Context ..... 2

II. Procedural History ..... 5

STANDARDS OF REVIEW ..... 6

A. Summary Judgment and Motion to Dismiss ..... 6

B. APA-Related Standards ..... 7

ARGUMENT ..... 8

I. Preliminary Arguments ..... 8

II. The Department Lacked Authority to Create or Enforce Plaintiff's Repatriation Loan, and Exceeded the Authority It Did Have ..... 9

A. No Authority ..... 9

B. In Excess of Authority ..... 12

III. Even if the Department Could Lawfully Charge Plaintiff for an Escort, the Department Violated Its Own Regulations ..... 17

A. Basic Eligibility ..... 17

B. Necessary Approvals ..... 17

C. Signature Requirements ..... 18

D. Other Expenses Outside FAM ..... 19

IV. The Department's Actions Are Arbitrary and Capricious, and the Loan Fails for That Independent Reason ..... 20

A. No Contemporaneous Explanation ..... 20

B. No Independent Judgment ..... 21

C. Important Aspects Ignored ........ 22
V. Due Process Cuts in Plaintiff's Favor ........ 23
VI. The Department's Remaining Arguments ........ 25
A. Counts Six, Seven, and Bivens ........ 25
B. Record-Related Arguments ........ 25
VII. Remedy ........ 25
CONCLUSION ........ 26
CERTIFICATE OF COMPLIANCE ........ 27

# TABLE OF AUTHORITIES

**Cases**

*A.C.R. v. Noem*,
809 F. Supp. 3d 103 (E.D.N.Y. 2025) .......... 8, 24

*Alzokari v. Pompeo*,
973 F.3d 65 (2d Cir. 2020) .......... 6, 7, 20

*Am. Council of Learned Societies v. Nat'l Endowment for the Humanities*,
2026 WL 1256545 (S.D.N.Y. May 7, 2026) .......... 6, 10

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 6

*Balderramo v. Go N.Y. Tours Inc.*,
668 F. Supp. 3d 207 (S.D.N.Y. 2023) .......... 6

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*,
176 F.4th 163 (2d Cir. 2026) .......... 8

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) .......... 10

*Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v. Pension Benefit Guar. Corp.*,
136 F.4th 26 (2d Cir. 2025) .......... 9

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .......... 10

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) .......... 25

*Caminetti v. United States*,
242 U.S. 470 (1917) .......... 10

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 8

*City of Arlington v. FCC*,
569 U.S. 290 (2013) .......... 8

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .......... 7

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........ 8

*Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*,
954 F.3d 118 (2d Cir. 2020) ........ 9

*Ford v. Shalala*,
87 F. Supp. 2d 163 (E.D.N.Y. 1999) ........ 22, 23

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ........ 23, 24

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) ........ 9

*Hadwan v. U.S. Dep't of State*,
139 F.4th 209 (2d Cir. 2025) ........ 22

*HVT, Inc. v. Port Auth. of N.Y. & N.J.*,
798 F. Supp. 3d 349 (E.D.N.Y. 2025) ........ 23

*Judge Rotenberg Educ. Ctr., Inc. v. FDA*,
3 F.4th 390 (D.C. Cir. 2021) ........ 10

*Kakar v. U.S. Citizenship & Immigr. Servs.*,
29 F.4th 129 (2d Cir. 2022) ........ 7, 20, 22

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ........ 9, 21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ........ 10

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 9

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ........ 22, 23

*Metro. Transp. Auth. v. Duffy (Duffy I)*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025) ........ 9, 10, 19, 22

*Metro. Transp. Auth. v. Duffy (Duffy II)*,
No. 25-CV-1413 (LJL), 2026 WL 588117 (S.D.N.Y. Mar. 3, 2026) ........ 11

*Moreira v. Societe Generale, S.A.*,
125 F.4th 371 (2d Cir. 2025) ........ 9

*Morton v. Ruiz*,
415 U.S. 199 (1974) ........ 24

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
894 F.3d 95 (2d Cir. 2018) ........ 11

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ........ 11

*O'Connor v. Pierson*,
426 F.3d 187 (2d Cir. 2005) ........ 23

*Ohio v. EPA*,
603 U.S. 279 (2024) ........ 19, 20

*Rusaviainvest, OOO v. Yellen*,
No. 18-CV-5676 (PGG), 2023 WL 6198256 (S.D.N.Y. Sept. 21, 2023) ........ 7

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ........ 10

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) ........ 9

*United States v. Ron Pair Enters., Inc.*,
489 U.S. 235 (1989) ........ 10

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........ 11

*Weise v. U.S. Dep't of State (Weise I)*,
2026 WL 392433 (S.D.N.Y. Feb. 12, 2026) ........ 1, 5, 24, 25

*Wilson v. Better Mortg. Corp.*,
811 F. Supp. 3d 631 (S.D.N.Y. 2025) ........ 10

**Statutes and Rules**

U.S. Const. amend. V ........ 22

5 U.S.C. § 701(a)(2) ........ 7

5 U.S.C. § 706(2)(A) ........ 7, 9, 16

5 U.S.C. § 706(2)(B) ........ 22

5 U.S.C. § 706(2)(C) ........ 8, 9, 16

5 U.S.C. § 706(2)(D) ........ 22

22 U.S.C. § 2671(b)(2)(B) ........ 10, 11

22 U.S.C. § 2671(b)(2)(E) ........ 10

22 U.S.C. § 2671(d) ........ 8, 10, 13

Fed. R. Civ. P. 41(a)(2) ........ 24

Fed. R. Civ. P. 56(a) ........ 6

**Regulations**

22 C.F.R. § 34.5(d) ........ 21

22 C.F.R. § 34.9 ........ 23

**Other Authorities**

7 FAM 374.2(14) ........ 14

7 FAM 374.2(16)(c) ........ 14, 18

7 FAM 374.3(a) ........ 8, 18

7 FAM 374.3(d) ........ 15, 18

7 FAM 374.3(e) ........ 8, 18

7 FAM 374.4(a) ........ 16

7 FAM 374.4(c) ........ 14

7 FAM 374.4(e) ........ 17, 19

7 FAM 374.4(f) ........ 8, 14, 17

7 FAM 374.4(f)(4) ........ 17

7 FAM 374.7-2(a)(4) ........ 12

7 FAM 375.2 .......... 12

7 FAM 376.4(3) .......... 14

Antonin Scalia & Bryan A. Garner,
*Reading Law: The Interpretation of Legal Texts* 93–100 (2012) .......... 12

Human Rights Watch,
*Poland: Brutal Pushbacks at Belarus Border* (Dec. 10, 2024) .......... 2

Plaintiff Wolfgang Weise ("Plaintiff" or "Weise") respectfully submits this memorandum of law in opposition to Defendant U.S. Department of State's ("State" or "Department") motion for summary judgment and motion to dismiss, *see* ECF Nos. 37, 79, and in support of his cross-motion for summary judgment.

## **INTRODUCTION**

In a pair of cases—*Weise I* and *Weise II*—Plaintiff challenges the Department's issuance and administration of a nearly $6,000 repatriation loan charged to him for his return to the United States. Plaintiff's own travel accounts for roughly one-third of that amount. The remaining two-thirds represents the cost of an escort that the Department decided Plaintiff needed, including the escort's onward flight to Tampa after the two had arrived in New York.

The Department may assist stranded citizens abroad, but it had no authority to do this. The repatriation loan statute allows the Secretary of State to advance the costs of returning a United States citizen home. It does not authorize loans covering a third party's travel, and it does not permit the Department to condition consular assistance on signing such an agreement. Agency action in excess of statutory authority must be set aside.

Even if the Department could impose an escort at such a cost, it never explained why it did. The record contains no medical or reasoned basis for concluding that Plaintiff could not board a plane alone. The Department decided first and billed Plaintiff late'r. An agency must examine the relevant evidence and articulate a satisfactory explanation for its action.

Most of all, the Department departed from its own guidelines, which impose specific prerequisites before an escort may be charged or a repatriation loan may be issued. It satisfied neither, and it never acknowledged the departure. That failure separately violates the *Accardi* doctrine and the Fifth Amendment's Due Process Clause.

## FACTUAL BACKGROUND[1]

### I. Relevant Context

Plaintiff Wolfgang Weise—formerly named Valery Katsnelson—is a U.S. citizen born in 1951 in Khabarovsk, Russia.[2] CAR I at 18; CAR II at 58. For the twenty years preceding the events giving rise to this litigation, he was a resident of Colorado, until he traveled to Europe to spend time with family.

It's unclear how Plaintiff first came into contact with the State Department. On or about March 12, 2021, Plaintiff contacted the Vienna consulate demanding to speak to the Ambassador and asking for help getting home to the United States. CAR II at 55-56. Nearly a year later, on February 28, 2022, the Minsk Embassy suspended operations and relocated to Vilnius. CAR I at 19; CAR II at 119 ¶ 11. Then, on or about June 1, 2022, with no U.S. resources on the ground in Minsk, Plaintiff turned to the International Organization for Migration ("IOM"), part of the United Nations and still operating in Minsk at the time, for help getting back to the United States. CAR II at 75.

Roughly a month later, IOM booked him a flight to New York, routed first through Vilnius and then Paris. CAR II at 75. Weise followed through, but his travel ended at the Lithuanian border, where he was denied entry. According to what Plaintiff reported to consular staff, a Lithuanian border guard "attacked" him and "punched him in the chest several times,"

---

[1] "CAR I" refers to the certified administrative record filed in *Weise I*, No. 24-cv-5760. "CAR II" refers to the certified administrative record filed in *Weise II*, No. 26-cv-4422.

[2] Plaintiff assumes the Court and parties' familiarity with the facts, particularly from *Weise I*.

and a chest x-ray "confirmed injuries in the tissues." CAR II at 88. Needless to say, Weise could not proceed, and he returned to Minsk.[3]

Back in Minsk, Weise initially lived in IOM-provided housing, which he was required to maintain to satisfy Belarusian registration requirements. CAR I at 18-19. IOM housed him from approximately early August to late October 2022. *Id.* IOM also conditioned any further travel on a medical evaluation, or on his being accompanied by a medical escort. *See, e.g.*, CAR II at 87 (IOM "deems [Plaintiff] too risky to fly without a medical escort, absent a medical evaluation").

Around the same time, starting in August 2022, IOM began discussing Weise's situation with the U.S. Embassy and asking for assistance. *See* CAR II at 73-75, 89. Weise renewed his own requests and began reaching out to the U.S. Consulate again. *See, e.g.*, CAR I at 18. Things ultimately fizzled, though, when IOM conditioned its assistance on his agreeing to a medical evaluation. CAR II at 67, 85. He refused, and IOM withdrew services on September 22, 2022. CAR II at 67.

The next day, and before Plaintiff had agreed to anything, a consular officer decided that the Department would supply an escort and bill him for it: "Given Mr. Katsnelson's alleged physical altercation with a Lithuanian borderguard and IOM's concerns, I think we would need to provide an escort. . . . We would need to add the escort's travel costs to the total cost of the loan." CAR II at 66. That same day, Plaintiff told the officer "that he is not ready to accept a repatriation loan." *Id.*

---

[3] *See also* Human Rights Watch, *Poland: Brutal Pushbacks at Belarus Border* (Dec. 10, 2024), https://www.hrw.org/news/2024/12/10/poland-brutal-pushbacks-belarus-border (last visited Aug. 10, 2026).

Consulate staff offered Weise a loan on at least four separate occasions, and each time he declined. *See* CAR II at 66, 83, 84, 85; CAR I at 18. He said no in particular to any loan that would require an evaluation or an escort. *See* CAR II at 83.

With nowhere to go and no further help from IOM, Plaintiff remained homeless. He lived at the Minsk central train station. *See* CAR I at 19; CAR II at 84. He stayed there until on or about November 10, 2022, when Belarusian authorities detained him for repeatedly failing to maintain his residence registration. CAR I at 19; CAR II at 93-95. He was taken to the Akrestsina Detention Center in Minsk, where he remained until his repatriation. At one point while there, on December 2, in a 40-minute call, Plaintiff told a consular officer that jail guards were mistreating him and that he could not sleep. CAR II at 82. Four days later, on December 6, Plaintiff asked the Department for a repatriation loan. CAR I at 19; CAR II at 82. On December 9, he "agreed to sign a repatriation loan for $5,000." CAR II at 82.

Then, on December 27, 2022, a consular officer came to Akrestsina, the only consular visit of Plaintiff's fifty-six days in detention, and Plaintiff signed a DS-3072. CAR II at 61, 62, 81. The form has no place for an applicant to state an amount. The consular officer enters it afterward, in a separate section reserved for official use. CAR II at 101-02. The officer wrote in $6,000 that same day, and the loan was approved that afternoon (Obligation No. 2022395325). See CAR I at 37-39; CAR II at 63, 78-81.

Three days later, on December 30, the tickets were purchased. CAR I at 14, 16; CAR II at 103-14. That single booking covered Plaintiff and the escort from Minsk to Newark on January 4, and it also covered the escort's return four days later, departing not from New York but from Tampa, Florida. CAR II at 107-08, 113. Plaintiff was released and flew Minsk to Istanbul to

Newark, arriving in the United States on January 4, 2023. CAR I at 19; CAR II at 62, 107. In total, the Department charged Plaintiff $5,951.17, broken down as follows:

- $4,366.17 for plane tickets for Plaintiff and the escort to New York;
- $725.50 in fees for the escort;
- $318 for two nights of lodging for the escort;
- $276.50 for meals and other incidental expenses for the escort;
- $150 for a charge Plaintiff owed the detention center; and
- $115 in subsistence.

CAR II at 118-19.

Of that total, the escort accounted for roughly 66 percent: $3,967.23, consisting of $2,647.23 in flights and $1,320 in lodging, meals, and fees. Plaintiff's own repatriation cost $1,983.94. CAR II at 115. The record says nothing about Tampa—what the escort was doing there, or why the Department booked his return leg out of Florida rather than out of New York, where he and Plaintiff had actually landed. Since then, Weise has remained in the New York area, homeless and unable to travel. Before his repatriation he had never visited New York and had no ties there.

Meanwhile, Plaintiff's debt was also referred to the Treasury Department, *see* CAR II at 233 (Feb. 9, 2024), which would eventually prompt the offset of his Social Security benefits starting on June 3, 2024. Until this Court's intervention, the offsets continued month after month, taking a total of $3,730.26 from Plaintiff's Social Security benefits. CAR II at 234. Of that, only $2,246.28 was applied to the principal. The rest went to penalties, offset fees, interest, and other charges. *Id.*

## II. <u>Procedural History</u>

On July 24, 2024, Plaintiff commenced *Weise I* pro se. On February 12, 2026, the Court issued an opinion granting in part and denying in part the government's motion for summary

judgment. *See Weise v. U.S. Dep't of State*, 2026 WL 392433 (S.D.N.Y. Feb. 12, 2026); *Weise I*, ECF No. 61; *see also Weise I*, ECF No. 80 at 12-13 (procedural history).

On May 27, 2026, Plaintiff commenced this action, *Weise II*, through undersigned counsel, challenging the validity of the underlying loan and the escort-related charges. ECF No. 1. On June 3, 2026, Plaintiff filed a request seeking a restraining order and a preliminary injunction to stay the Department's offset of Plaintiff's Social Security benefits. *See* ECF Nos. 14-17. The Court granted that request and, on consent, later entered a preliminary injunction against the Department. *See* ECF Nos. 74, 77. The Court also entered a briefing schedule in both cases, which was later jointly extended by the parties.

Plaintiff amended his complaint to name additional defendants, and the Second Amended Complaint, *see* ECF No. 29 ("SAC"), serves as the operative complaint.

## STANDARDS OF REVIEW

### A. Summary Judgment and Motion to Dismiss

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Since the Department partially moved to dismiss the complaint, *see* ECF No. 37 at 1, a reviewing court "construe[s] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Alzokari v. Pompeo*, 973 F.3d 65, 67 n.1 (2d Cir. 2020) (cleaned up). On cross-motions for summary

judgment, a court applies the same standard and "reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration." *See Balderramo v. Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207, 219-20 (S.D.N.Y. 2023) (cleaned up); *Am. Council of Learned Societies v. Nat'l Endowment for the Humanities*, 2026 WL 1256545, at *19 (S.D.N.Y. May 7, 2026) (same).

**B. APA-Related Standards**

The Administrative Procedure Act ("APA") authorizes a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Alzokari*, 973 F.3d at 70 (citation omitted). "This reflects the 'settled proposition' that 'in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.'" *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019)).

"In a case involving review of a final agency action under the APA, however, 'the usual Rule 56 summary judgment standard does not apply . . . because the district judge sits as an appellate tribunal, and [t]he entire case on review is a question of law.'" *Rusaviainvest, OOO v. Yellen*, No. 18-cv-5676 (PGG), 2023 WL 6198256, at *4 (S.D.N.Y. Sept. 21, 2023) (cleaned up) (collecting cases).

///

## ARGUMENT

### I. Preliminary Arguments

The State Department argues that the Court lacks jurisdiction because the decisions at issue are committed to agency discretion by law, leaving no law for the Court to apply. *See* ECF No. 49 at 11-13. That is far from the case.

*First*, 5 U.S.C. § 701(a)(2) is a "very narrow exception" applying only in "those rare instances" where a statute is so broad there is literally no law to apply. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (exception is read "quite narrowly"). In support of its argument, the Department cites *Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*, 176 F.4th 163, 185 (2d Cir. 2026). There, the court found that the Federal Reserve Bank was not an "agency" within the meaning of the APA, and that even if it were, its decisions were committed to agency discretion by law. *Id.* Unlike here, the relevant statute in *Banco* said that "Reserve Banks 'may' accept deposits." *Id.* Section 2671, by contrast, says that the Secretary "shall," and goes on to list a number of requirements. *See* 22 U.S.C. § 2671(d).

Apart from that, Plaintiff principally disputes the scope of the agency's authority to create and enforce a six-thousand-dollar loan. *See City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013). A claim that an agency acted "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), is therefore never a claim committed to agency discretion, because an agency has no discretion to exceed the authority Congress gave it.

*Second*, there is ample law for the Court to apply, starting with the Department's Foreign Affairs Manual ("FAM" or "Manual"). Take, for instance, 7 FAM 374.4(f), which requires

special approval for escort fees above $1,000. *See, e.g.*, 7 FAM 374.3(a), (e); *see also Weise I*, ECF No. 15 at 7 (examples of FAM-related violations).

For its part, the Department devotes nearly eight pages to demonstrating that it complied with the FAM. Yet it cannot invoke the FAM as the measure of its own reasonableness and simultaneously use it to argue that the FAM forecloses judicial review. *Cf. A.C.R. v. Noem*, 809 F. Supp. 3d 103, 117 (E.D.N.Y. 2025) (rejecting similar arguments). Either way, an agency is bound by its own guidance. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954); *Fed. Defs. of N.Y. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020).

On top of that, following the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), courts can no longer defer to an agency's interpretation of a statute. *Id.* at 395. Under *Loper Bright*, courts must "independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion" appropriately. *Id.* at 404.

## II. <u>The Department Lacked Authority to Create or Enforce Plaintiff's Repatriation Loan, and Exceeded the Authority It Did Have</u>

### A. No Authority

The Department's authority begins and ends with the text of the statute, because the statute is what confers that authority in the first place. "An agency can take only such actions as Congress has enabled it to take." *Metro. Transp. Auth. v. Duffy* (*Duffy I*), 784 F. Supp. 3d 624, 668 (S.D.N.Y. 2025); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it"). When interpreting a federal statute—including one that an agency is charged with administering—the court must "exercise independent judgment." *Bd. of Trs. of Bakery Drivers Loc. 550 & Indus. Pension Fund v. Pension Benefit Guar. Corp.*, 136 F.4th 26, 29 (2d Cir. 2025) (quoting *Loper Bright*, 603 U.S. at 394). In

the APA context, the Court is required to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or otherwise "not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

The "starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) (citation omitted); *see Moreira v. Societe Generale, S.A.*, 125 F.4th 371, 388 (2d Cir. 2025); *Wilson v. Better Mortg. Corp.*, 811 F. Supp. 3d 631, 637 (S.D.N.Y. 2025) (same). Where, as here, the language of a statute is plain, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)); *see Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 51 (2d Cir. 2025); *Duffy I*, 784 F. Supp. 3d at 675 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020)).

Applying those standards, the text of the statute is clear. Section 2671 authorizes only (1) "loans" made to destitute citizens outside the United States, and (2) made for the purpose of providing for their return to the United States. *See* 22 U.S.C. § 2671(b)(2)(B). Congress further required the Department to obtain: (1) a verifiable address and Social Security number; and (2) a "written loan agreement which includes a repayment schedule." 22 U.S.C. § 2671(d)(1)–(2).

Nothing in the text of the statute authorizes the Department to pay for escort travel or airfare. *See* 22 U.S.C. § 2671(b)(2)(B). And "[i]f no statute confers authority to a federal agency, it has none." *Am. Council of Learned Societies*, 2026 WL 1256545, at *29 (quoting *Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 3 F.4th 390, 399 (D.C. Cir. 2021)). If anything, the word "escort" appears exactly once in all of Section 2671, and then only in subsection (b)(2)(E), which authorizes expenditures for "travel of the President, the Vice President, or a Member of Congress

to a foreign country, including advance arrangements, escort, and official entertainment." 22 U.S.C. § 2671(b)(2)(E).

Congress plainly knew how to authorize an escort when it meant to. It did so for three categories of traveler and no one else. "It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (quotation omitted); *see Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93–100 (2012) ("What the legislature 'would have wanted' it did not provide, and that is an end of the matter").

Indeed, Congress authorized loans "made to provide for *the return to the United States* of *its citizens*." 22 U.S.C. § 2671(b)(2)(B) (emphasis added). The Department nonetheless charged Plaintiff $2,647.23 for the round-trip transportation of a foreign national. The authority to issue repatriation loans is not the same as the authority to create loans for third-party travel or to enforce predatory loan practices. "It is well settled that an agency may only act within the authority granted to it by statute." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108 (2d Cir. 2018).

The statute limits the Department's authority to issue repatriation loans to limited purposes and circumstances. Congress did not give State the authority to saddle an elderly, destitute man with another person's travel debt and then collect on it through his Social Security benefits. *See id.* (an agency's power to act is based on "only those authorities conferred upon it by Congress"). That authority does not extend to a second person's airfare, lodging, and fees, which have nothing to do with Plaintiff's "return to the United States." *See also Util. Air Regul. Grp. v. EPA*, 573 U.S.

302, 327 (2014) (an agency's authority to administer a statute "does not include a power to revise clear statutory terms").

Alternatively, for the same reasons, the Department's actions are *ultra vires*. "Ultra vires review is available where an agency has taken an action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Metro. Transp. Auth. v. Duffy* (*Duffy II*), No. 25-CV-1413 (LJL), 2026 WL 588117, at *61–62 (S.D.N.Y. Mar. 3, 2026) (cleaned up) (quoting *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025)). So even accepting the Department's version of events as true—that Plaintiff knowingly signed everything and agreed both to the loan and to paying for an escort—the escort charge remains outside the power Congress granted the agency. An agency cannot expand its authority by pointing to a loan signature.

### B. In Excess of Authority

The Department exceeded its statutory authority by unilaterally deciding that Plaintiff needed an escort and then charging him roughly twice the cost of his own return—and more than three times the escort estimate initially provided to him—for a service no physician ever prescribed or deemed necessary.

**Plaintiff never agreed to a loan, let alone to an escort's costs.** The record shows he was offered a loan and declined on at least four occasions. *See supra.* He expressly refused any loan involving an escort or an evaluation. CAR II at 84. The Department's own rules make that refusal a deal breaker. "The U.S. Government DOES NOT repatriate a U.S. citizen without their consent." 7 FAM 374.7-2(a)(4). And no funds may be committed at all before execution: "Do not give money or commit funds for a repatriate before executing Form DS-3072. The consular

officer is personally liable for funds committed or expended in the absence of an executed Form DS-3072." 7 FAM 375.2.

On top of that, the Department committed Plaintiff to an escort three months before Plaintiff assented to anything. On September 23, 2022, a consular officer wrote:

> Medical escort: The FAM states, "A person suffering from mental illness or other condition that could make him/her a possible danger to others should not board an aircraft without a required escort." Given Mr. Katsnelson's alleged physical altercation with a Lithuanian borderguard and IOM's concerns, **I think we would need to provide an escort**. . . . We would need to add the escort's travel costs to the total cost of the loan.
> CAR II at 66 (emphasis added).

The same email goes on: that Plaintiff "said that he is not ready to accept a repatriation loan," and that "[a]bsent his willingness to sign a DS-3072 to agree to the loan, we aren't able to proceed with assistance." *Id.*

**The escort requirement did not originate in any State Department determination at all.** In fact, IOM deemed Plaintiff "too risky to fly without a medical escort, absent a medical evaluation." CAR II at 87. Once he refused the evaluation, IOM withdrew services. The Department then adopted IOM's risk assessment as its own. The one clinical assessment that actually occurred cuts the other way, and the Government concedes it in a footnote. ECF No. 49 at 7 n.3 (citing CAR II at 83). The IOM physician "refused to sign 'certifcate [sic] of mental condition.'" CAR II at 83; *see also* CAR II at 63, 100.

**The agreement also fails to satisfy basic statutory requirements.** Section 2671(d) provides that the Secretary shall "require the borrower to provide a verifiable address and social security number *at the time of application*," and shall "require a written loan agreement which includes a repayment schedule." 22 U.S.C. § 2671(d)(1)–(2) (emphasis added). Neither condition was satisfied.

For one thing, Line 13 of the form calls for a "Verifiable Billing Address at Final Destination in United States or other Permanent Address (Not a Post Office Box)." Line 14 of Plaintiff's form reads: "To be determined." CAR II at 100. The Department's systems recorded the same non-answer—"U.S. Home Address: Tbd," CAR II at 60, 63—and it approved the loan that same afternoon. Nor does the "verified" address the Department reported thirteen days later help: it listed a third-party office suite in Baltimore, Maryland, where Plaintiff never lived, worked, or received mail. CAR II at 119. Nothing in the record suggests that Plaintiff planned to go to Baltimore or had any ties there. The opposite appears to be true: Plaintiff was to go to New York for "[p]lacement in to a homeless shelter in New York, NY." CAR II at 64.

For another, Part 2 of the form contains no repayment schedule at all. It recites a promise to repay "within 30 days of initial billing," and provides that "[i]f I am unable to pay this loan in full, the Department of State may, at its discretion and upon my request, forward to me an installment agreement containing an installment plan for repayment of my loan." CAR II at 101. Yet the $5,951.17 eventually charged was not determined until January 9, 2023. *See* CAR II at 118.

**The agreement Plaintiff signed never mentioned an escort's costs whatsoever.** Part 1 contains no dollar figure at all, even though the consular officer is required to enter one, including a breakdown of all costs associated with the domestic portion of the trip. *See* 7 FAM 374.2(16)(c). Nothing in the promissory note disclosed that $3,967.23 of the $6,000 would pay for another man's airfare, hotel, meals, and fee (and a stop in Florida).[4] That omission is

[4] The form is incomplete with respect to the Privacy Act, which governs the release of information. It is unsigned and undated, and only the separate authorization for release to HHS was completed. CAR II at 102. The Department's guidance provides that "[t]his section must be completed even if the applicant signed a separate Privacy Act Waiver." 7 FAM 374.2(14). The

significant, given that escort fees are "subject to approval by CA/OCS/ACS *and the applicant*." 7 FAM 374.4(f) (emphasis added). And "[a]s the signatory of the loan, an applicant has the final say in the selection of the escort." *Id.* 374.4(c). The record contains no evidence on this point. From the looks of it, the choice of escort was left to consulate staff. *See* CAR II at 62, 82.

**The surrounding circumstances reinforce the lack of assent on Plaintiff's part.** At the time he agreed to a loan, Weise was seventy-one years old and had been held at the Akrestsina detention center in Minsk for forty-seven days. The address he gave as his "[c]urrent lodging" on the loan application was the detention center itself. CAR II at 100. The Department made a single consular visit across his fifty-six days in detention, and that visit was the one at which he signed. CAR II at 61, 62, 81. What is more, the consular officer who signed and certified Part 4, approving the loan, was in Vilnius. He therefore never saw Plaintiff or the executed original, and worked instead from photographs. *See* CAR II at 62 (agreeing to send pictures of the application later for upload).

**Even assuming assent, Plaintiff at most agreed to $1,200.** The only evidence in the record of Plaintiff's agreement to any escort charge is the consular officer's contemporaneous note of the December 27 detention visit:

> Former Embassy Minsk employee Mr. [Piskun] has agreed to serve as the travel escort. His total cost request of $1,200, including lodging, per diem, insurance, visa application fee, and escort fee, was acceptable to Mr. Katsnelson.
> CAR II at 62; *accord* CAR II at 81.

That is the most the record could arguably support, but the Department then charged Plaintiff $3,967.23. *See* CAR II at 65, 119.

---

record likewise contains no indication that Plaintiff received the copy of the executed form to which he was entitled. *See* 7 FAM 376.4(3).

**The loan amount changed, and costs were added after Plaintiff signed.** In one telephone call with consular staff, according to internal notes, Plaintiff "agreed to sign a repatriation loan for $5,000." CAR II at 82. Eighteen days later, he was presented with a loan for $6,000. CAR II at 102. The Department's rules speak directly to this: "If the loan amount increases or if additional costs are identified and added to the loan, the applicant must complete a new Form DS-3072." 7 FAM 374.3(d) (emphasis added). No such form was completed.

Apart from that, the Department cannot have it both ways. If the form was complete when Plaintiff signed it, the Department must identify record evidence of that fact, and it has offered none beyond the executed form itself. If the form was not complete, then the single document on which its entire theory rests was obtained on unlawful grounds. Either way, a $6,000 figure written onto a form before any travel was booked cannot establish that Plaintiff agreed to the $5,951.17 later assembled and billed to him.

Because the Department created this obligation without the assent Congress and its own rules require; in an amount exceeding any assent the record reflects; on an instrument lacking the elements § 2671(d) makes mandatory; and to fund expenditures § 2671(b)(2)(B) does not authorize, the loan is invalid. The agency actions predicated upon it—the assessment, the billing, the referral to Treasury, and the resulting offset of Plaintiff's benefits—were taken "in excess of statutory jurisdiction, authority, or limitations" and "not in accordance with law," and should be set aside. 5 U.S.C. § 706(2)(A), (C).

///

///

## III. <u>Even if the Department Could Lawfully Charge Plaintiff for an Escort, the Department Violated Its Own Regulations</u>

### A. Basic Eligibility

Assuming the Department can lawfully charge for an escort as part of a repatriation loan, it failed to follow its own procedures. Among other things, the FAM authorizes escorts for citizens who are "physically ill or mentally disabled" or otherwise in need. 7 FAM 374.4(a).

No such determination was ever made in Plaintiff's case. He declined a medical evaluation, by the government's own admission. Instead, that conclusion is based on an internal email by consulate staff that Plaintiff "could . . . be a possible danger to others," CAR II at 66. That danger is referring to a secondhand report about an incident between Plaintiff and border authorities. In reality, "[a] Lithuanian border guard *attacked* Mr. Katsnelson and punched him in the chest several times," and that a chest x-ray "confirmed injuries in the tissues." CAR II at 88 (emphasis added). Even though Weise was the victim in this situation, the Department seemingly treated him as the aggressor and a danger to others. And even accepting that logic, a danger to others is not a basis for imposing the costs of an escort on the citizen. Nothing else in the record reflects a medical determination, and the Department's own file reads:

- Under "Medical Records," "No (Physician Unknown)";
- The "Diagnosis" and "Date Able to Travel" fields are blank; and
- Line 12 of the loan application ("Medical condition, current injuries, or limited mobility relevant to evacuation") was left empty.
  *See* CAR II at 63, 100.

### B. Necessary Approvals

The Manual also permits escort fees only "subject to approval by CA/OCS/ACS *and the applicant*," and directs that "[p]osts must obtain concurrence of CA/OCS/ACS before expending such funds." 7 FAM 374.4(f). The record contains no such approval. Tellingly, the Government's

brief is silent on § 374.4(f). On top of that, the escort's compensation alone—not even counting airfare—was $1,320.00, which the Department apparently advanced to him in cash on December 29, 2022. CAR II at 65, 116, 119 ¶ 7. Even assuming *arguendo* that this figure is the "fee," a further approval was required and is likewise missing from the record. *See* 7 FAM 374.4(f)(4) (CAR II at 30).

Two further FAM requirements went unsatisfied. The Manual authorizes a second night of the escort's lodging only "[i]n extraordinary instances where the length of travel is 16 hours or more," and then only if "authorized by CA/OCS." 7 FAM 374.4(e) (CAR II at 29). The Department charged Plaintiff two nights and produced no CA/OCS authorization. And the Manual forbids the escort fee outright if the escort was Department personnel: "CA/OCS/ACS will not authorize escort fees for official personnel, including locally employed staff (LE staff), eligible family members (EFM), etc." 7 FAM 374.4(f).

### C. Signature Requirements

The FAM provides that a citizen applicant "should not sign Part 1, line 92 of Form DS-3072 until the dollar amount of the loan is entered in Part 3 by the consular officer." 7 FAM 374.3(a); *see also* 7 FAM 374.2(16)(c). Put simply, amount first, signature second. That did not happen here in any meaningful sense. To name a few things:

- Part 1 (where Weise signed at line 92) contains no dollar figure at all. CAR II at 101-02.
- The loan amount appears only in Part 3, "For Official Use Only," where a consular officer wrote in "$6,000." *Id.*
- Part 3 is otherwise blank: foreign currency, subsistence, subsistence dates, and the cost breakdown were all empty. CAR II at 28.

In the Government's view, the escort's "total cost request of $1,200 . . . was acceptable to Plaintiff." ECF No. 49 at 7 (citing CAR II at 81). Plaintiff was charged $3,967.23 for that escort.

CAR II at 65, 119.[5] Whatever Plaintiff assented to on December 27, 2022, it was no more than $1,200 on this record. The additional $2,767.23 was therefore identified and added to Plaintiff's loan without a new form, which violates the FAM on a separate basis. 7 FAM 374.3(d). To the extent the Department argues that the final figure was a reduction from the $6,000 written on the form, the FAM required that to be separately documented too. *See* 7 FAM 374.3(e) ("both the applicant and the consular officer must initial and date each change in Part 3"). That did not happen either.

Beyond all of that, the Government cannot have it both ways. In other words, if the form was complete when Plaintiff signed it, the Department must point to record evidence, and it has offered nothing beyond the form. Conversely, if the form was not complete, then the central document of Plaintiff's assent is in violation of the regulation the Department itself relies on.

**D. Other Expenses Outside FAM**

The Manual permits a loan to "include the cost of the escort's travel and per diem (M&IE and Lodging) to the *last U.S. city where the repatriate will be received* by local authorities or family members," with lodging "as close to the airport as possible *for a single night*." 7 FAM 374.4(e) (CAR II at 29) (emphasis added). It then states: "If the escort decides to remain in the United States beyond this period of time, any expenses incurred are the responsibility of the escort." *Id.*

Moreover, Plaintiff's loan accounted his two nights' lodging and, at the same time, included "five travel days of M&IE," CAR II at 65, and another budget referred to"$237 for three non-travel days," CAR II at 80. Regardless, both budgets were prepared well before Plaintiff's

[5] $1,718.94 outbound airfare, $928.29 return airfare, $318.00 lodging, $276.50 M&IE, plus $725.50 fee equals $3,967.23. CAR II at 65, 119.

departure, and not incidentally or after arrival. The original booking, as drafted, listed each flight: Minsk to Newark on January 4, then Tampa to Frankfurt on January 8 and Frankfurt to Vilnius on January 9, all issued as a single booking on December 30, 2022. CAR II at 107–08. Nothing in records explains why the Department bought a ticket originating in Florida (before the escort ever left Belarus) and charged it to Plaintiff.

## IV. The Department's Actions Are Arbitrary and Capricious, and the Loan Fails for That Independent Reason

An agency action is arbitrary "if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The Court "must ensure . . . that the agency has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* And "[a]n agency acts arbitrarily and capriciously when it takes actions that are not justified by its stated bases." *Duffy I*, 784 F. Supp. 3d at 679 (citation omitted).

### A. No Contemporaneous Explanation

For starters, the record contains discrepancies that go unexplained and go to the heart of Plaintiff's claims:

- *Tampa.* Plaintiff flew to Newark, but the escort was returned to Vilnius on a $928.29 cost-constructed ticket departing from Tampa, Florida. CAR II at 65, 107-14. Tampa appears nowhere else in this record. Nothing explains what the escort was doing there, why the Department purchased that leg on December 30 before he ever left Belarus, or why Plaintiff was charged for it.
- *Escort line items.* The final cable reports M&IE of $276.50 for four days. CAR II at 119. The disbursement record for the same money states that it "covers *five* travel days." CAR II at 65. The pre-approval budget provided for something different again, with no explanation. CAR II at 80.
- *The escort fee moved without explanation*. The internal breakdown prepared on the day Plaintiff signed set the escort fee at $400. CAR II at 80. The fee billed was $725.50. CAR II at 119 ¶ 7. Nothing in the record accounts for the difference.

None of these points is reconciled in the record. An agency that cannot show how it arrived at the figure it took from a citizen's benefits has not offered a satisfactory explanation for taking it. *Ohio*, 603 U.S. at 292.

Where the Department supplies reasons, they are counsel's reasons, offered for the first time in litigation. An explanation that "runs counter to the evidence before the agency" is arbitrary. *Alzokari*, 973 F.3d at 70. The Department's assertion that the escort requirement was "reasonable . . . as evidenced by Plaintiff's concerning behavior and statements and deteriorating physical health," ECF No. 49 at 16, is as unfounded as it is belated. Review is "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Kakar*, 29 F.4th at 132.[6]

**B. No Independent Judgment**

In relying on IOM, the Department failed to exercise its own judgment. IOM's determination rested on Plaintiff's own unsubstantiated statement together with "some irregularities in his behaviour." CAR II at 67. The Department adopted the conclusion as it own.

The Department invokes 22 C.F.R. § 34.5(d) for the proposition that its failure to comply with any provision in the regulations is not a defense to repayment of the debt. ECF No. 49 at 4. The provision cannot bear that weight here, for three reasons. *First*, by its terms § 34.5(d) addresses noncompliance with the debt-collection regulations. It says nothing about the FAM, and nothing about the statute. *Second*, a regulation cannot dispense with a statutory requirement anyway. Section 2671(d) requires a verified address and a written loan agreement with a

[6] For whatever it is worth, the Department's answer is that "should" is permissive and that there are "many factors affecting costs of travel," including that "it may not be appropriate to purchase a ticket far in the future to obtain a lower price." ECF No. 49 at 13. That explanation appears nowhere in the record. It was composed for the brief, and it cannot sustain the agency's action. *See Kakar*, 29 F.4th at 132.

repayment schedule. An agency's rule about collection does not authorize it to collect on a loan agreement the statute did not authorize it to make. *Cf. La. Pub. Serv. Comm'n*, 476 U.S. at 374. *Third*, § 34.5(d) presupposes a valid debt and speaks only to defenses against repaying it. That is not the case here, nor does it answer the Fifth Amendment issues.

**C. Important Aspects Ignored**

As explained above, Plaintiff never agreed to a loan, let alone to an escort's costs; he was offered one and declined on at least four occasions. By December, Plaintiff was detained at Akrestsina and awaiting deportation. In one telephone call with Defendant Knapp, he reported that guards were torturing him and that sleep was impossible. CAR II at 82. On December 27, a consular officer came to the facility in person (the visit during his fifty-six-day detention) and Plaintiff signed for a repatriation loan. CAR II at 61, 62, 81.

The Department knew what Plaintiff was going through: He was seventy-one years old, in a cell with a dozen men and one toilet, and sleep deprived. It is striking that the agency obtained a signature from such a person while simultaneously maintaining that he was too impaired to fly alone. Four years later, the government still relies on that signature to justify garnishing a homeless man's Social Security benefits, and treats it as consent to everything that flowed from the loan.

To date, the Department has never provided an adequate explanation for any of its decisions. Because the agency's action is "not justified by its stated bases," *Duffy I*, 784 F. Supp. 3d at 679, and because the reasons it now offers were composed for its brief rather than drawn from the contemporaneous record, *Kakar*, 29 F.4th at 132, the loan and the collection actions taken upon it are arbitrary and capricious and must be set aside.

## V. <u>Due Process Cuts in Plaintiff's Favor</u>

Plaintiff asserts a Due Process claim under the Fifth Amendment. U.S. Const. amend. V. That violation also implicates the APA, because the Department's conduct is "contrary to constitutional right" and can be set aside on that basis as well. 5 U.S.C. § 706(2)(B). Agency action taken "without observance of procedure required by law" must likewise be set aside. 5 U.S.C. § 706(2)(D).

***Protected interest.*** As a threshold matter, *Mathews* applies where there is a protected liberty or property interest. *See Hadwan v. U.S. Dep't of State*, 139 F.4th 209, 224 (2d Cir. 2025); *see also Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The protected interest here is Plaintiff's Social Security benefits, which are property protected by the Fifth Amendment. *See, e.g., Ford v. Shalala*, 87 F. Supp. 2d 163, 175 (E.D.N.Y. 1999) (types of government benefits covered). The Department does not dispute that its offset deprived Plaintiff of that interest.

"To determine whether [Plaintiff] received the process he was due, we must consider: (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; (3) the government's interest, including the possible burdens of alternative procedures." *O'Connor v. Pierson*, 426 F.3d 187, 197 (2d Cir. 2005) (citing *Mathews*, 424 U.S. at 335); *see HVT, Inc. v. Port Auth. of N.Y. & N.J.*, 798 F. Supp. 3d 349, 357-58 (E.D.N.Y. 2025) (collecting cases). Each factor favors Plaintiff.

***Private interest.*** The first factor "is the nature of the potential deprivation created by that decision." *Ford*, 87 F. Supp. 2d at 176. For many, including Plaintiff, benefits like Social Security "provide[] the means to obtain essential food, clothing, housing, and medical care." *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970) (citation omitted). Plaintiff is homeless; his benefits

are what he lives on. Where a person "lacks independent resources," his "situation becomes immediately desperate," and that need "to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress." *Id.* That applies with full force here.

***Risk of deprivation.*** The second factor decisively cuts in Plaintiff's favor, because Plaintiff disputes that he ever agreed to this loan in the first place. The record itself contains multiple red flags surrounding the loan, as explained *supra*. The escort's line items are reported three different ways across three documents, and the Department's reconciliation of the escort's airfare misstates two of the three. CAR II at 65, 80, 119. Even then, the amount Plaintiff was told he was agreeing to on December 9 was $5,000, not the $6,000 written eighteen days later. *See* CAR II at 82, 102.

***The government's interest.*** The relevant inquiry is the fiscal and administrative burden the additional procedure would impose. *Mathews*, 424 U.S. at 335. That burden is minimal here. The Department already maintains a process for reviewing waiver and deferral applications, and it already maintains an internal administrative review process under 22 C.F.R. § 34.9. *See* CAR II at 228.

"These rights are important in cases," especially as here, where the agency decision is predicated "on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Goldberg*, 397 U.S. at 268 (emphasis added). Because all three factors favor Plaintiff, the Department was required to give him notice of the basis and the calculation of the debt, and a meaningful opportunity to contest it, before offsetting his benefits. It did neither. SAC ¶¶ 110-11, 117-19.

Separately, the Department's failure to comply with the Manual implicates *Accardi*. "The *Accardi* doctrine states that '[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures,' even when those procedures are 'possibly more rigorous than otherwise would be required.'" *A.C.R.*, 809 F. Supp. 3d at 125 (quoting *Morton v. Ruiz*, 415 U.S. 199, 235 (1974)).

## VI. <u>The Department's Remaining Arguments</u>

### A. Counts Six, Seven, and *Bivens*

The Department makes arguments related to Counts Six and Seven as well as Plaintiff's *Bivens* claims, which are largely pled in the alternative. Without making any concessions, Plaintiff will promptly move to dismiss these claims without prejudice, and will file either a stipulation of dismissal or a motion under Rule 41(a)(2) promptly with this filing.

### B. Record-Related Arguments

The Department's scope-of-review and presumption-of-regularity arguments are the same ones it pressed in *Weise I*, and Plaintiff's responses there apply with equal force here. *See Weise I,* ECF No. 82 at 1-4. Plaintiff incorporates those arguments by reference. Also, neither argument applies to Plaintiff's Fifth Amendment claims, which are not bound by the same APA rules.

## VII. <u>Remedy</u>

Plaintiff should have the loan and underlying agreement nullified, and his passport returned so that he may obtain another one should he choose. The Department should also return the monies it garnished from Plaintiff's benefits over the past two years—restitution of the $3,730.26 already offset. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). At minimum, the $819.08 in penalties, $478.37 in Treasury fees, and accrued interest must fall with any invalidated principal and be returned to Plaintiff. CAR II at 234.

At most, Plaintiff should be responsible for the amount that actually provided for his return to the United States. The Court should deduct the escort-related amounts from Plaintiff's loan obligation and offset the remaining balance by the aggregate amount garnished from his Social Security benefits. Given that the Department has already taken $3,730.26 from Plaintiff, he would owe nothing further, and the Department should be required to return the difference. The Court may, however, rule differently on the passport revocation and denial claims in *Weise I*, and that in turn may affect this case.

## CONCLUSION

For all these reasons, Plaintiff respectfully requests that the Court grant his cross-motion and deny the government's motion.

Dated: September 1, 2026
New York, NY

THE ATLANTIC FOUNDATION

By: *__/s/ Sami Elamad__*

Sami Elamad
450 Lexington Ave., #69
New York, NY 10163
Tel. (646) 685-3954
Fax (646) 712-9501
sami@the-atlantic-foundation.org

*Attorneys for*
*Plaintiff Wolfgang Weise*

**CERTIFICATE OF COMPLIANCE**

I, Sami Elamad, pursuant to Local Civil Rule 7.1(c), hereby certify that the foregoing memorandum of law contains 7,724 words, exclusive of the caption, table of contents, table of authorities, signature block, and this certificate, based on the word count feature for the software used to prepare this filing (Microsoft Word).

Dated: September 1, 2026
New York, NY

*/s/ Sami Elamad*